UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KORY T. O'BRIEN,<br><br>    Plaintiff,<br><br>    v.<br><br>K. E. SAID,<br><br>    Defendant. | Case No.: 1:18-cv-00741-NONE-SAB (PC)<br><br>FINDINGS AND RECOMMENDATIONS REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT<br><br>(ECF No. 78) |

Plaintiff Kory T. O'Brien is appearing *pro se* and *in forma pauperis* in this civil rights action pursuant to 42 U.S.C. § 1983.

Currently before the Court is Defendant El-Said's motion for summary judgment, filed February 12, 2021.

## I.

## PROCEDURAL BACKGROUND

This action is proceeding against Defendant El-Said for deliberate indifference to Plaintiff's elevated cholesterol levels from 2012 to 2016, resulting in Plaintiff having a heart attack in June 2016 while incarcerated at the California Correctional Institution (CCI).

Defendant filed an answer to the complaint December 3, 2019. (ECF No. 39.)

On January 6, 2020, the Court issued the discovery and scheduling order. (ECF No. 43.)

///

On February 12, 2021, Defendant filed the instant motion for summary judgment. (ECF No. 78.) Plaintiff filed an opposition on March 31, 2021, and Defendant filed a reply on April 14, 2021. (ECF Nos. 81, 84.)

## II.

## LEGAL STANDARD

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011). Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). The Court may consider other materials in the record not cited to by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

In resolving cross-motions for summary judgment, the Court must consider each party's evidence. Tulalip Tribes of Washington v. Washington, 783 F.3d 1151, 1156 (9th Cir. 2015); Johnson v. Poway Unified Sch. Dist., 658 F.3d 954, 960 (9th Cir. 2011). A cross-motion for summary judgment requires the court to apply the same standard and rule on each motion independently. Creech v. N.D.T. Indus., Inc., 815 F. Supp. 165, 166–67 (D.S.C. 1993). When both parties have moved for summary judgment, "[t]he granting of one motion does not necessarily warrant the denial of the other motion, unless the parties base their motions on the same legal theories and same set of material facts." Stewart v. Dollar Fed. Sav. & Loan Ass'n, 523 F. Supp. 218, 220 (S.D. Ohio 1981) (citing Schlytter v. Baker, 580 F.2d 848, 849 (5th Cir. 1978)). Plaintiff bears the burden of proof at trial, and to prevail on summary judgment, he must affirmatively demonstrate that no reasonable trier of fact could find other than for him. Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). Defendant does not bear the burden of proof at trial and in moving for summary judgment, he need

1  only prove an absence of evidence to support Plaintiff's case.  In re Oracle Corp. Sec. Litig., 627 F.3d
2  376, 387 (9th Cir. 2010).

3  In judging the evidence at the summary judgment stage, the Court does not make credibility
4  determinations or weigh conflicting evidence, Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984
5  (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most
6  favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry
7  of judgment, Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d at 942
8  (quotation marks and citation omitted).

9  In arriving at these Findings and Recommendations, the Court carefully reviewed and considered
10 all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses
11 thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument,
12 document, paper, or objection is not to be construed to the effect that this Court did not consider the
13 argument, document, paper, or objection. This Court thoroughly reviewed and considered the evidence
14 it deemed admissible, material, and appropriate.

## III.

## DISCUSSION

### A. Summary of Plaintiff's Allegations

18  Dr. El-Said was Plaintiff's primary care physician from 2013 until November 2016.  On June
19 28, 2016, Plaintiff suffered a heart attack at approximately 12:30 a.m.  Upon arriving at San Joaquin
20 Community Hospital on June 28, 2016, Dr. Ghandforogh immediately placed Plaintiff on statin and
21 advised him that his left coronary artery was completely blocked due to high cholesterol.

22  When Plaintiff returned to the hospital, he was interviewed by Dr. Hill and asked why he was
23 never informed that he suffered high cholesterol.  After Plaintiff received and reviewed his medical
24 file, Plaintiff discovered that Dr. El-Said was indifferent to his medical needs.

25  On January 16, 2014, a blood test was ordered, which showed low good HDL cholesterol,
26 borderline high bad LOL cholesterol, high triglycerides and the non-HDL good cholesterol was high.
27 The lab results were noted by psychiatry and forwarded to Dr. El-Said.  Psychiatry requested a chronic

care appointment. However, Dr. El-Said did not ask for a follow-up appointment, even though psychiatry recognized the need for medical intervention.

On January 26, 2015, a doctor felt there was no need for a follow-up appointment; however, the test on January 23, 2015, revealed borderline high total cholesterol, borderline high triglycerides, borderline high LDL bad cholesterol, and the HDL good cholesterol was low.

On February 23, 2016, a lipid/cholesterol panel was ordered.

On March 9, 2016, an electrocardiogram (EKG) was done on Plaintiff's heart, and Plaintiff's blood pressure was elevated.

On March 22, 2016, blood testing was collected which showed high levels of cholesterol in all areas.

On March 24, 2016, psychiatry asked for an appointment with Plaintiff's primary care physician.

On April 7, 2016, Dr. El-Said stated on a CDCR medical form, "I reviewed lab results and determined it was not medically significant patient does not need to be seen on any urgent matter or any other date than upcoming appointment."

Three months later, on June 28, 2016, Plaintiff suffered a heart attack.

### B. Statement of Undisputed Facts[1]

1. In August 2012, Plaintiff Kory O'Brien entered the custody of the California Department of Corrections and Rehabilitation (CDCR). His blood pressure was 132/86. (Medical Records (MR) at 1, 4-5, attached as Ex. A to Esquivel Decl., ECF No. 76-4 )

2. On September 13, 2012, O'Brien's total cholesterol was 156 mg/dL. (MR at 2-3.)

3. Plaintiff was incarcerated at CCI from December 13, 2012 to November 2016. (MR at 6; Pl. Dep. at 26:8-19, Ex. B to Esquivel Decl.)

4. Plaintiff underwent an initial health screening upon arrival at CCI on December 13, 2012, and his blood pressure was 135/70. (MR at 6.)

5. Defendant El-Said was a Physician and Surgeon at CCI from approximately 2009 to

---

[1] Hereinafter referred to as "UF."

4

April 2016. In mid or late April 2016, he stopped working at CCI due to an illness, and on May 31, 2016, he was officially placed on medical leave. He remained on leave until he left the employment of CDCR on March 31, 2018. (El-Said Decl. ¶ 2, ECF No. 76-2.)

6. El-Said first treated Plaintiff on December 21, 2012. Plaintiff complained of low-back and right-shoulder pain. He was otherwise healthy. His vital signs were normal, with a blood pressure of 117/71, and his physical exam was within normal limits. The medical records reflect that Dr. El-Said educated Plaintiff on eating healthy, exercising regularly, and maintaining his weight, and he prepared a request for Plaintiff to receive physical therapy for his right shoulder. El-Said also issued work-restriction order, limiting Plaintiff's lifting, and prescribed him pain medication. (El-Said Decl. ¶¶ 9, 27; MR at 7-11, 17.)

7. Based on El-Said's customary practice, he reviewed Plaintiff's September 13 lab results and noted that his cholesterol level was within normal range. (El-Said Decl. ¶ 10, MR at 2-3.)

8. From 2013 to 2016, Plaintiff was treated by mental-health staff at CCI. Plaintiff was prescribed various medications, including Geodon, Zoloft, and Tegretol.[2] (Moustafa Decl. ¶¶ 4-5; MR at 19-20.)

9. Because some of the psych medications Plaintiff was prescribed adversely affected his lipid and cholesterol levels, Plaintiff's mental-health providers ordered complete blood count (CBC), comprehensive metabolic panel (CMP), HbA1c (blood-sugar levels), lipid panel (cholesterol and triglyceride levels), and other laboratory tests for him every six to twelve months. In addition, his heart health was monitored with an electrocardiogram (EKG).[3] (Moustafa Decl. ¶ 5.)

10. On January 24, 2013, Plaintiff's lipid panel was tested at the request of Dr. Moustafa, one of his psychiatrists. The results of the January 24 blood work showed that his total cholesterol was 181 mg/dL; his DHL cholesterol was 36mg/dL; his LDL cholesterol was 128 mg/dL; his non-HDL cholesterol was 145; his CHOL/HDLC ratio was 5.0; and his triglycerides were 86 mg/dL.

---

[2] Defendant incorrectly references "Geodon" as "Gideon" in the motion for summary judgment.

[3] Plaintiff cannot attempt to dispute this statement of fact by way of his lay opinion, interpretation, or disagreement of the medical notes. Fed. R. Evid. 701.

5

Although Plaintiff's good cholesterol was slightly low, overall the results were unremarkable and within normal limits, and Plaintiff was notified of the results.[4]  (MR at 12-16; El-Said Decl. ¶ 11.)

11. On March 6, 2013, El-Said saw Plaintiff for his continued complaints of low-back and right-shoulder pain.  Plaintiff's vital signs were normal (his blood pressure was 133/88), and his physical examination was unremarkable.  The medical records reflect that El-Said educated Plaintiff on eating healthy, exercising regularly, and maintaining his weight, and reviewed Plaintiff's January 24 lab results with him.[5]  (MR at 18; El-Said Decl. ¶¶ 12, 27.)

12. On August 9 and October 28, 2013, additional lab work was performed on Plaintiff at the request of his mental-health providers, but his lipid panel was not tested.  Plaintiff was informed of the results of his lab work.  (MR at 21-27.)

13. On October 23, 2013, Dr. Naficy, one of Plaintiff's psychiatrists, ordered that he undergo an EKG, and the EKG was performed in February 2014.  Plaintiff's EKG was normal and showed a blood pressure of 132/86.  (MR at 25, 28, 31.)

14. On January 14, 2014, Dr. Naficy ordered that Plaintiff lipid panel be tested, and two days later he underwent the bloodwork.  The lab report showed that Plaintiff's total cholesterol was 196 mg/dL; his DHL cholesterol was 31 mg/dL; his LDL cholesterol was 122 mg/dL; his non-HDL cholesterol was 165; and his CHOL/HDLC ratio was 6.3.  The lab report also showed that his triglycerides were slightly elevated at 216 mg/dL.  (MR at 29-21; El-Said Decl. ¶ 13.)

15. El-Said received a copy of the lab report on January 21, 2014.  Although Plaintiff's cholesterol ratio and non-HDL level had slightly increased, this was not concerning because his total cholesterol and LDL cholesterol were still within normal range.  Also given Plaintiff's relatively young age (39 years old at the time), the slight increase could have been an anomaly caused by something he ate the day before or he did not fast before his blood sample was taken.  Nevertheless,

---

[4] Plaintiff cannot attempt to dispute this statement of fact by way of his lay opinion, interpretation, or disagreement of the medical notes.  Fed. R. Evid. 701.

[5] Plaintiff cannot attempt to dispute this statement of fact by way of his lay opinion, interpretation, or disagreement of the medical notes.  Fed. R. Evid. 701.

El-Said issued a Notification and Diagnostic Test Results informing Plaintiff that his lab work was not clinically significant and would be discussed at his upcoming medical appointment. (MR at 30-32; El-Said Decl. ¶ 13.)

16. On February 3, 2014, El-Said saw Plaintiff for various issues including his continued complaints of low-back and right-shoulder pain. Plaintiff's vital signs were within normal range; his blood pressure was 138/88. He had gained over 20 pounds since El-Said last saw him. El-Said reviewed the January 21 lab results with Plaintiff, and the medical records reflect that he educated Plaintiff on a healthy diet, exercising regularly, and losing and maintaining his weight. (MR at 33; El-Said Decl. ¶¶ 14, 27.)

17. El-Said determined that medication or other treatment for his slightly elevated cholesterol ratio and non-HDL cholesterol, as reflected in the January 21 lab results, was not medically indicated. Exercise and healthy nutrition, coupled with his relatively young age, were sufficient to address the increased levels in his lipid panel results.[6] (El-Said Decl. ¶ 14.)

18. Dr. Naficy ordered blood work for Plaintiff on February 13 and August 12, 2014, but these did not include a lipid panel test. (MR at 34-40.)

19. Plaintiff's blood pressure was taken and recorded three additional times in 2014 during his mental-health appointments as follows: 133/38 on March 18; 122/80 on August 12; and 122/80 on October 24. (Pl. Dep. at 61:1-22, 61:23-62:15, 62:16-63:23.)[7]

20. On January 12, 2015, Dr. Bryant, another psychiatrist on Plaintiff's treatment team, ordered a lipid panel test, and his blood was collected on January 23, 2015. The lab results showed that Plaintiff's total cholesterol was 175 mg/dL; his HDL cholesterol was 31 mg/dL; his LDL cholesterol was 117 mg/dL; his non-HDL cholesterol was 144 mg/dL; and his CHOL/HDLC ratio was

---

[6] Plaintiff cannot attempt to dispute this statement of fact by way of his lay opinion, interpretation, or disagreement of the medical notes. Fed. R. Evid. 701.

[7] In response, Plaintiff asserts that he was not provided with pages 61 through 63 of his deposition testimony. (ECF No. 81 at 52.) Defendant concedes that Plaintiff is correct and provided the pages with the reply. (ECF No. 84, Ex. B.) Nonetheless, Defendant correctly points out that the oversight did not prejudice Plaintiff because this testimony refers to mental-health records that Plaintiff provided in discovery and were discussed at his deposition. (Pl. Dep. at 60:22-25.)

5.6. The lab result also showed that his triglycerides level decreased to within normal range at 135 mg/dL. (MR at 41-43; El-Said Decl. ¶ 16.)

21. Three days later, El-Said saw Plaintiff for his continued low-back and shoulder-pain. His vital signs were normal; his blood pressure was 112/74; and he lost some weight since the last visit. His physical examination was unremarkable other than his complaints of pain. El-Said reviewed the results of Plaintiff's recent lab work with him, prescribed him pain medication, and the medical notes indicate Plaintiff was educated on eating healthy, exercising regularly, and maintaining his weight. Although Plaintiff's cholesterol ratio was still slightly elevated, this was not significant given that his total cholesterol, bad cholesterol, and triglycerides levels were within normal range. (MR at 42-45; El-Said Decl. ¶¶ 15-16, 27.)

22. On February 10, 2015, Plaintiff underwent an EKG that was ordered by Dr. Bryan. El-Said received a copy of the results a few days later and noted that the EKG was normal. (MR at 46-47; El-Said Decl. ¶ 17.)

23. El-Said saw Plaintiff on July 13, 2015, for a follow-up appointment for his continued complaints of low-back and shoulder-pain. Plaintiff's vital signs were within normal range; his blood pressure was 112/74; his weight appeared stable; and he did not have any new complaints. His physical exam was within normal limits. El-Said reviewed the results of his most recent lab work and EKG with Plaintiffs, and reminded him to eat healthy, exercise regularly, and maintain his weight. (MR at 48; El-Said Decl. ¶¶ 18, 27.)

24. Dr. Bryant ordered additional blood work for Plaintiff on August 5, 2015, but did not include a lipid panel test. (MR at 49-51.)

25. Plaintiff's blood pressure was taken and recorded four additional times in 2015 during his mental health appointments as follows: 118/76 on March 12; 137/84 on June 4; 144/90 on July 15; and 129/83 on October 26. (Pl. Dep. at 71:4-25, 74:21-75:13, 79:1-12, 80:9-20; MR at 51.)

///
///
///
///

26. On January 5, 2016, Plaintiff was scheduled to see El-Said, but Plaintiff refused his appointment.[8] (MR at 52.)

27. On February 23, 2016, Dr. Narayan, one of Plaintiff's mental-health providers, ordered an EKG and blood work, including a lipid panel test, for Plaintiff. The EKG was conducted on March 9, 2016. Although Plaintiff's blood pressure was slightly elevated at 141/96, his EKG was normal. The EKG report does not bear Plaintiff's signature or initials. (MR at 53-55; El-Said Decl. ¶ 19.)

28. Plaintiff's lipid panel test was collected on March 22, 2016. The report showed that Plaintiff's total cholesterol was 206 mg/dL; his HDL cholesterol was 31 mg/dL; his LDL cholesterol was 143 mg/dL; his non-HDL cholesterol was 175 mg/dL, and his CHOL/HDLC ratio was 6.6. His triglycerides also increased to 162 mg/dL. The lab report does not bear Plaintiff's signature or initials. (MR at 56-57; El-Said Decl. ¶ 20.)

29. On March 24, 2016, Dr. Moustafa received the results of Plaintiff's March 22 lab work. She prepared a Notification of Diagnostic Test Results (CDCR 7393) the same day, notifying Plaintiff that a chronic care appointment was scheduled for him. Dr. Moustafa ordered that this chronic care appointment be merged with his next medical-provider appointment. The purpose of the chronic care appointment was to discuss and address his elevated lipid panel. (MR at 58; Moustafa Decl. ¶¶ 7-8.)

30. Dr. Moustafa determined that Plaintiff elevated lipid panel did not pose a substantial risk of serious harm to him or that he had a serious or emergent medical condition that required immediate referral to a medical provider. Plaintiff was relatively young (41 years old at the time), and there was no indication that he had a history of elevated cholesterol levels or heart disease. Further, his cholesterol and triglycerides levels were slightly above normal. Based on these factors, she determined that Plaintiff did not have a serious or emergent medical condition that required an urgent or immediate referral to a medical provider. (Moustafa Decl. ¶ 9.)

///

///

---

[8] Plaintiff submits no evidence to support his contention that he refused to attend this appointment because it was for dermatological issues. (ECF No. 81 at 56.) Further, there is nothing in the refusal notice to reflect that appointment was related to dermatology. (MR 52, ECF No. 76-4 at 55.)

31.     After receiving the March 22 blood results, Dr. Moustafa did not contact El-Said to request that he immediately see Plaintiff for his elevated cholesterol levels since she had concluded that immediate medical care was not indicated for Plaintiff's elevated cholesterol levels. (Moustafa Decl. ¶ 10.)

32.     On April 7, 2016, El-Said prepared an Interdisciplinary Progress Note indicating that he reviewed Plaintiff's "lab results" and determined that they were not medically significant such that Plaintiff needed to be seen on an urgent basis or at any other time before his upcoming scheduled appointment. Plaintiff's lipid panel levels were not clinically significant, nor indicative that he needed an urgent medical appointment. His lipid panel levels were only slightly elevated and given his low risk factors, there was no medical evidence to suggest that he was suffering from heart disease or any other serious medical condition that required immediate medical attention. (MR at 59; El-Said Decl. ¶ 21; Moustafa Decl. ¶ 9.)

33.     El-Said did not personally see Plaintiff after July 2015, and Defendant left CCI in mid- to late April 2016, before Plaintiff's next scheduled appointment. (El-Said Decl. ¶¶ 1, 18, 26.)

34.     Immediate medical care and medication were not indicated for Plaintiff's slightly elevated lipid panel levels in March and April 2016. Based on his medical history, he did not have any risk factors. Plaintiff never informed El-Said that he had a family history of cardiovascular disease. (El-Said Decl. ¶¶ 22-25; Pl. Dep. at 98:14-100:12.)

35.     On June 26, 2016, Plaintiff started experiencing chest pain, resulting in his transfer to an outside facility. He reported a "family history of heart disease." He was diagnosed with a myocardial infraction and underwent catheterization with stent placement. Plaintiff was discharged two days later and returned to CCI. (MR at 60-67.)

36.     On June 26, 2016, medical staff found that Plaintiff had 'no cardiac history." (MR at 63, 68.)

37.     At his August 12, 2016 mental-health appointment, Plaintiff reported that his psychiatrist informed him that Geodon causes heart disease. (MR at 69; Moustafa Decl. ¶ 5.)

///

///

38. Plaintiff submitted five inmate grievances that were processed by CDCR officials and one grievance (submitted in October 2016) that was not responded to which he contends concerns El-Said's conduct as alleged in this lawsuit. (Pl.'s Resp. Interrog. 1, Ex. C to Esquivel Decl.; Pl. Dep. at 138:10-139:22; 148:4-24; Appeals at Exs. D-H.)

39. The five inmate grievances that O'Brien submitted and the October 2016 grievance that was not processed were submitted more than thirty days after he suffered his heart attack on June 26, 2016. (Pl. Dep at 138:10-139:22; MR at 60-67; Appeals at Exs. D-H.)

### C. Analysis of Defendant's Motion

Defendant argues that Plaintiff's elevated cholesterol levels did not amount to a serious medical need, and Defendant had no information from which he could reasonably infer that Plaintiff faced a substantial risk of a heart attack. In the alternative, Defendant argues he is entitled to qualified immunity.[9]

While the Eighth Amendment of the United States Constitution entitles Plaintiff to medical care, the Eighth Amendment is violated only when a prison official acts with deliberate indifference to an inmate's serious medical needs. Snow v. McDaniel, 681 F.3d 978, 985 (9th Cir. 2012), overruled in part on other grounds, Peralta v. Dillard, 744 F.3d 1076, 1082-83 (9th Cir. 2014); Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012); Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006). Plaintiff "must show (1) a serious medical need by demonstrating that failure to treat [his] condition could result in further significant injury or the unnecessary and wanton infliction of pain," and (2) that "the defendant's response to the need was deliberately indifferent." Wilhelm, 680 F.3d at 1122 (citing Jett, 439 F.3d at 1096). The requisite state of mind is one of subjective recklessness, which entails more than ordinary lack of due care. Snow, 681 F.3d at 985 (citation and quotation marks omitted); Wilhelm,

---

[9] Defendant also moves for summary judgment on the ground that Plaintiff failed to exhaust the administrative remedies. However, the Court's discovery and scheduling order set a specific deadline to file a motion for summary for failure to exhaust the administrative remedies, and set a separate deadline to file a dispositive motion (other than a motion for summary judgment for failure to exhaust). (ECF No. 43.) Defendant sought and was granted two extensions of the deadline to file an exhaustion-related motion for summary judgment, but the deadline expired on November 16, 2020 and no exhaustion motion was filed. Thus, it is clear that Defendant knew of the deadline to file an exhaustion motion, yet the deadline lapsed and Defendant did not move to be excused from the deadline. Accordingly, because Defendant knowingly failed to file a separate exhaustion-related motion for summary judgment, the Court declines to address the exhaustion issue raised in the dispositive motion.

11

680 F.3d at 1122.

"A difference of opinion between a physician and the prisoner – or between medical professionals – concerning what medical care is appropriate does not amount to deliberate indifference." Snow, 681 F.3d at 987 (citing Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989), overruled in part on other grounds, Peralta, 744 F.3d at 1082-83; Wilhelm, 680 F.3d at 1122-23 (citing Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1986).  Rather, Plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that the defendants chose this course in conscious disregard of an excessive risk to [his] health." Snow, 681 F.3d at 988 (citing Jackson, 90 F.3d at 332) (internal quotation marks omitted). ).  In addition, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle v. Gamble, 429 U.S. 97, 106 (1977); Snow v. McDaniel, 681 F.3d at 987-88, overruled in part on other grounds, Peralta v. Dillard, 744 F.3d at 1082-83; Wilhelm, 680 F.3d at 1122.

Here, viewing the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff suffered an objectively serious medical need having suffered a heart attack on June 26, 2016.  The Court now turns to whether Dr. El-Said knew that Plaintiff faced a substantial risk of a heart attack and failed to treat him accordingly.

It is undisputed that from 2013 to 2016, Plaintiff was treated by mental-health staff at CCI.  Plaintiff was prescribed various medications, including Geodon, Zoloft, and Tegretol.  (UF 8.)  Because some of the psych medications Plaintiff was prescribed adversely affected his lipid and cholesterol levels, Plaintiff's mental-health providers ordered complete blood count (CBC), comprehensive metabolic panel (CMP), HbA1c (blood-sugar levels), lipid panel (cholesterol and triglyceride levels), and other laboratory tests for him every six to twelve months.  In addition, his heart health was monitored with an electrocardiogram (EKG).  (UF 9.)

On January 24, 2013, Plaintiff's lipid panel was tested at the request of Dr. Moustafa, one of his psychiatrists.  The results of the January 24 blood work showed that his total cholesterol was 181 mg/dL; his DHL cholesterol was 36mg/dL; his LDL cholesterol was 128 mg/dL; his non-HDL cholesterol was 145; his CHOL/HDLC ratio was 5.0; and his triglycerides were 86 mg/dL.

Although Plaintiff's good cholesterol was slightly low, overall the results were unremarkable and within normal limits, and Plaintiff was notified of the results. (UF 10.)

On March 6, 2013, El-Said saw Plaintiff for his continued complaints of low-back and right-shoulder pain. Plaintiff's vital signs were normal (his blood pressure was 133/88), and his physical examination was unremarkable. The medical records reflect that El-Said educated Plaintiff on eating healthy, exercising regularly, and maintaining his weight, and reviewed Plaintiff's January 24 lab results with him. (UF 11.)

On August 9 and October 28, 2013, additional lab work was performed on Plaintiff at the request of his mental-health providers, but his lipid panel was not tested. Plaintiff was informed of the results of his lab work. (UF 12.)

On October 23, 2013, Dr. Naficy, one of Plaintiff's psychiatrists, ordered that he undergo an EKG, and the EKG was performed in February 2014. Plaintiff's EKG was normal and showed a blood pressure of 132/86. (UF 13.)

On January 14, 2014, Dr. Naficy ordered that Plaintiff lipid panel be tested, and two days later he underwent the bloodwork. The lab report showed that Plaintiff's total cholesterol was 196 mg/dL; his DHL cholesterol was 31 mg/dL; his LDL cholesterol was 122 mg/dL; his non-HDL cholesterol was 165; and his CHOL/HDLC ratio was 6.3. The lab report also showed that his triglycerides were slightly elevated at 216 mg/dL. (UF 14.) El-Said received a copy of the lab report on January 21, 2014. Although Plaintiff's cholesterol ratio and non-HDL level had slightly increased, this was not concerning because his total cholesterol and LDL cholesterol were still within normal range. Also given Plaintiff's relatively young age (39 years old at the time), the slight increase could have been an anomaly caused by something he ate the day before or he did not fast before his blood sample was taken. Nevertheless, El-Said issued a Notification and Diagnostic Test Results informing Plaintiff that his lab work was not clinically significant and would be discussed at his upcoming medical appointment. (UF 15.)

On February 3, 2014, El-Said saw Plaintiff for various issues including his continued complaints of low-back and right-shoulder pain. Plaintiff's vital signs were within normal range; his blood pressure was 138/88. He had gained over 20 pounds since El-Said last saw him. El-Said

1  reviewed the January 21 lab results with Plaintiff, and the medical records reflect that he educated
2  Plaintiff on a healthy diet, exercising regularly, and losing and maintaining his weight. (UF 16.) El-
3  Said determined that medication or other treatment for his slightly elevated cholesterol ratio and non-
4  HDL cholesterol, as reflected in the January 21 lab results, was not medically indicated. Exercise and
5  healthy nutrition, coupled with his relatively young age, were sufficient to address the increased levels
6  in his lipid panel results. (UF 17.)

7  Dr. Naficy ordered blood work for Plaintiff on February 13 and August 12, 2014, but
8  these did not include a lipid panel test. (UF 18.)

9  Plaintiff's blood pressure was taken and recorded three additional times in 2014 during
10 his mental-health appointments as follows: 133/38 on March 18; 122/80 on August 12; and 122/80 on
11 October 24. (UF 19.)

12 On January 12, 2015, Dr. Bryant, another psychiatrist on Plaintiff's treatment team,
13 ordered a lipid panel test, and his blood was collected on January 23, 2015. The lab results showed
14 that Plaintiff's total cholesterol was 175 mg/dL; his HDL cholesterol was 31 mg/dL; his LDL
15 cholesterol was 117 mg/dL; his non-HDL cholesterol was 144 mg/dL; and his CHOL/HDLC ratio was
16 5.6. The lab result also showed that his triglycerides level decreased to within normal range at 135
17 mg/dL. (UF 20.) Three days later, El-Said saw Plaintiff for his continued low-back and shoulder-
18 pain. His vital signs were normal; his blood pressure was 112/74; and he lost some weight since the
19 last visit. His physical examination was unremarkable other than his complaints of pain. El-Said
20 reviewed the results of Plaintiff's recent lab work with him, prescribed him pain medication, and the
21 medical notes indicate Plaintiff was educated on eating healthy, exercising regularly, and maintaining
22 his weight. Although Plaintiff's cholesterol ratio was still slightly elevated, this was not significant
23 given that his total cholesterol, bad cholesterol, and triglycerides levels were within normal range.
24 (UF 21.)

25 On February 10, 2015, Plaintiff underwent an EKG that was ordered by Dr. Bryan. El-
26 Said received a copy of the results a few days later and noted that the EKG was normal. (UF 22.)

27 El-Said saw Plaintiff on July 13, 2015, for a follow-up appointment for his continued
28

complaints of low-back and shoulder-pain. Plaintiff's vital signs were within normal range; his blood pressure was 112/74; his weight appeared stable; and he did not have any new complaints. His physical exam was within normal limits. El-Said reviewed the results of his most recent lab work and EKG with Plaintiffs, and reminded him to eat healthy, exercise regularly, and maintain his weight. (UF 23.)

Dr. Bryant ordered additional blood work for Plaintiff on August 5, 2015, but did not include a lipid panel test. (UF 24.) Plaintiff's blood pressure was taken and recorded four additional times in 2015 during his mental health appointments as follows: 118/76 on March 12; 137/84 on June 4; 144/90 on July 15; and 129/83 on October 26. (Pl. Dep. at 71:4-25, 74:21-75:13, 79:1-12, 80:9-20; MR at 51; UF 25.)

On January 5, 2016, Plaintiff was scheduled to see El-Said, but Plaintiff refused his appointment. (UF 26.)

On February 23, 2016, Dr. Narayan, one of Plaintiff's mental-health providers, ordered an EKG and blood work, including a lipid panel test, for Plaintiff. The EKG was conducted on March 9, 2016. Although Plaintiff's blood pressure was slightly elevated at 141/96, his EKG was normal. The EKG report does not bear Plaintiff's signature or initials. (UF 27.) Plaintiff's lipid panel test was collected on March 22, 2016. The report showed that Plaintiff's total cholesterol was 206 mg/dL; his HDL cholesterol was 31 mg/dL; his LDL cholesterol was 143 mg/dL; his non-HDL cholesterol was 175 mg/dL, and his CHOL/HDLC ratio was 6.6. His triglycerides also increased to 162 mg/dL. The lab report does not bear Plaintiff's signature or initials. (UF 28.)

On March 24, 2016, Dr. Moustafa received the results of Plaintiff's March 22 lab work. She prepared a Notification of Diagnostic Test Results (CDCR 7393) the same day, notifying Plaintiff that a chronic care appointment was scheduled for him. Dr. Moustafa ordered that this chronic care appointment be merged with his next medical-provider appointment. The purpose of the chronic care appointment was to discuss and address his elevated lipid panel. (UF 29.) Dr. Moustafa determined that Plaintiff elevated lipid panel did not pose a substantial risk of serious harm to him or that he had a serious or emergent medical condition that required immediate referral to a medical provider. Plaintiff was relatively young (41 years old at the time), and there was no indication that he had a history of

elevated cholesterol levels or heart disease. Further, his cholesterol and triglycerides levels were slightly above normal. Based on these factors, she determined that Plaintiff did not have a serious or emergent medical condition that required an urgent or immediate referral to a medical provider. (UF 30.) After receiving the March 22 blood results, Dr. Moustafa did not contact El-Said to request that he immediately see Plaintiff for his elevated cholesterol levels since she had concluded that immediate medical care was not indicated for Plaintiff's elevated cholesterol levels. (UF 31.)

On April 7, 2016, El-Said prepared an Interdisciplinary Progress Note indicating that he reviewed Plaintiff's "lab results" and determined that they were not medically significant such that Plaintiff needed to be seen on an urgent basis or at any other time before his upcoming scheduled appointment. Plaintiff's lipid panel levels were not clinically significant, nor indicative that he needed an urgent medical appointment. His lipid panel levels were only slightly elevated and given his low risk factors, there was no medical evidence to suggest that he was suffering from heart disease or any other serious medical condition that required immediate medical attention. (UF 32.)

El-Said did not personally see Plaintiff after July 2015, and Defendant left CCI in mid- to late April 2016, before Plaintiff's next scheduled appointment. (UF 33.)

As explained above, Plaintiff's lipid-panel levels were essentially within normal limits until March 2016. Defendant reviewed Plaintiff's lab results from 2012 to 2016 and determined that they were not significant or indicative of more aggressive treatment, such as medication. In monitoring a patient's risk for heart disease, a medical provider will look at all the various levels measured by a lipid panel. (El-Said Decl. ¶ 7.) No one single level in a lipid-panel test determines a patient's risk for cardiovascular disease. (Id.) Rather, all levels are considered to predict a patients risk for heart disease or stroke along with other risk factors, such as age, family history, smoking status, and high blood pressure. (Id.) In addition, one lipid-panel test is not a reliable measure for cardiovascular risk. (Id.) Regular monitoring or testing is necessary to provide a reliable predictor of a patient's risk. (Id.)

Based on his medical history, Plaintiff did not have any risk factors. There is no evidence that Plaintiff was diabetic, a smoker, or that he had high blood pressure. Indeed, as explained above, Plaintiff's blood-pressure readings were within normal range. At age 41, Plaintiff's age was not a concern. Plaintiff never informed El-Said that he had a family history of cardiovascular disease. (UF

16

34.) With the exception of the March 2016 lab results, a physician usually informed Plaintiff that his lab results were essentially within normal limits. In addition, Dr. Moustafa, who received and reviewed the March 22, 2016 lab results, determined that Plaintiff did not have a serious medical need that required immediate medical attention and Plaintiff was scheduled for a routine appointment with his medical provider. (UF 30.) Plaintiff has failed to submit evidence to demonstrate that his plaque build-up which caused his heart attack was present in April 2016 (or any other prior date that he was treated by Defendant), or that his psychotropic medications or other internal processes did not hasten the plaque build-up after April 7, 2016. Nor has Plaintiff demonstrated that his March 2016 lipid panel results revealed the presence of "lipid-rich plaque" sufficient to cause a heart attack. Under these circumstances, the appropriateness or adequacy of the selected treatment is not properly second guessed by the Court and is, at best, a claim for negligent treatment—which does not constitute unconstitutional deliberate indifference. Estelle, 429 U.S. at 106. Accordingly, Defendant's motion for summary judgment should be granted.[10]

## IV.

## RECOMMENDATIONS

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. Defendant's motion for summary judgment be granted; and

2. Judgment be entered in favor of Defendant.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within **thirty (30) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time

///

///

---

[10] In light of this recommendation, the Court does not reach Defendant's alternative argument for entitlement to qualified immunity.

may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:  **October 26, 2021**

UNITED STATES MAGISTRATE JUDGE